My name is Megan Misko. I'm here representing Deren Smith in this case. And it is a rather simple case. It is a Jones Act case. There is no question that Mr. Smith is a seaman. There is no question that he was injured at work. Basic is paying maintenance and cure. They've paid for shoulder surgery. He's a 35-year-old man who was injured pulling a pipe out of a hole as a floor hand on a rig. Injured his shoulder. Hasn't gone back to work since. The issue is Basic filed a motion for summary judgment saying there's no issues of fact. Judge Feldman granted it. And a few days before the settlement conference, before its discovery had been completed, its plaintiff's position that there certainly is. There are multiple issues of fact that prevent this from being thrown out. And this is not the kind of case that should be thrown out on a summary judgment. He's a Jones Act seaman. There's a featherweight burden. When Judge Feldman wrote his opinion on the initial opinion after the motion for summary judgment, he focused a lot on the summary judgment standard. But the Fifth Circuit said you have to look at the summary judgment standard in reference to the Jones Act burden for a seaman. And it's not something, you know, it's not as cut and dry as, you know, a Rule 56 motion because what we've got is even this court saying even marginal claims are properly left for jury determination. We submit this is certainly not a marginal claim. Under the Jones Act, employers have a duty to provide a safe place for their employees to work. Mr. Smith has testified that they were being rushed to complete the job that day. There is no question that a jury can find that if they have the testimony of a single witness over the testimony of other witnesses who are all employed by the employer, they can find for that plaintiff. If you're rushing to complete . . . Judge Feldman said he didn't, it wasn't demonstrated how that contributed to his accident. They were tripping pipe and his injury occurred when he says the weight was heavier than he expected it to be. Yes, Your Honor, and we think there are genuine issues in how rushing actually contributed to that. Mr. Davis, who was the derrickman on the rig that day, testified, and it's in the record, you know, the wiper rubber that's supposed to get the oil off the pipes as they're coming up, it wears out pretty quickly. And, you know, there's a lot of attention made by BASIC to, you know, he had stopped work authority. If the employer's telling him, if the tool pusher's saying, hey, we've got to get done today, you know, you're rushing it through. There's a pretty plausible explanation that you're not going to stop and replace everything. You're not going to stop and clean everything off every couple of minutes. Not everything's . . . I mean, there wasn't any evidence that the strippers weren't working properly, though, was there? I'm sorry? Was there any evidence that there was anything wrong with the strippers, that they were worn or needed changing? No. You know, Mr. Smith, and Mr. Smith thought they were working, but the issue is that it was more mud that was coming up that he was not. We're going faster. We're trying to move this pipe through and get done today. There's more, and Mr. Smith testified, there's more drilling mud on the pipe that day. It made it heavier than it had been in the past. He'd done this job in the past. This is mud that would stick to the pipe as it came out of the hole? Yeah, it's oil-based mud. The tool pusher and the derrickman testified it's sticky. It's not something . . . it'll stay there. Once the vacuum stops working after a couple of minutes, which Mr. Davis testified, then they have to wash it off with a hose, and two of the witnesses said, but it's oil-based mud. The water's not exactly going to get it real, real clean. They have mats on the ground, but the issue is there's more mud coming up. It's on the pipe, and it's falling down on the V-door, and it's making it heavier. Mr. Davis was the derrickman who was on the floor. The driller had asked him to be on the rig floor with the two floor hands to assist on that day, and he left at a certain point in the process. Mr. Smith pointed out, that's when I got injured. That's when I felt the pop because I didn't have that third person helping. These pipes weigh . . . even the defense's expert says they weigh about 360 pounds. They're being elevated, but that's going to take pressure, and if that mud really is kicking off and kicking on and sticking on, and it's heavier than normal, as Mr. Smith testified, that genuinely it creates an issue of fact that should have been left to the jury. This isn't really a case where there's no question at all. There's conflicting testimony, and that . . . Isn't that accumulation of the mud just inevitable? What was the negligent conduct, even if you have that causation? The rushing. The problem is it's going to build up faster if you're not taking time to clean it off, even though they don't necessarily know if the rubber was working or not. He said, I think it was working. Mr. Smith testified that it's because we're going so fast, there's just not going to be time to clean it up. It was his responsibility to clean it up, right? He had stop work authority, but you've got to get into . . . The stop work authority is something that, if they're rushing, it's almost a red herring. How is he going to sit there and say, no, I've got to keep cleaning it up? If he's correct and he testified, no, I was told we've got to finish that day, that's a question for, I think, a fact finder or a jury. He didn't tell anybody he was having any difficulty other than the way it normally would be, and he had the stop work authority, and it was his job to clean the mud. So how would . . . Is that all correct? He did have stop work authority, yes, and . . . He didn't tell anybody he was having difficulty. No, that is correct. But it is his job to clean the mud off. It's a floor hands job. There were two floor hands, yes. And the other issue is that if they were rushing through the job as he testified, I think there's a real question on whether or not anybody would have been allowed to sit there and stop every two minutes, every couple of minutes to allow the vacuum to clean up the mud. Does he have any corroboration from the men on his crew that they were rushing or . . . No, Your Honor. Or that there was more mud on the pipe than usual? No, Your Honor. They're all still employed by BASIC. They're all still employees of defendant, and he's no longer employed. Well, of course, the other problem is since he didn't say anything, there's nothing to trigger those co-employees' memory about that day, I suppose. You're correct, Your Honor, and that goes to another concerning issue that even Judge Feldman noted was concerning is that if his testimony is to be believed, they were told not to report accidents on that particular hitch because there had already been several accidents reported and they were afraid of losing the contract with the client, Hillcorp. And if that's true, that's a concerning issue that should be left to a jury because really what this does is it takes what we think is a Jones Act case with a lot of issues that are questionable. There's testimony on both sides. This is really a very typical case that should have gone to the jury. Judge Feldman's decision takes it out of the hands of the fact-finders who really in a Jones Act case should be the ones deciding. What is the fact issue? The fact issue was the mud building up, or should they have let Shelley Davis lead? You said there were all these myriad fact issues. Articulate the fact issues. The fact issue is this is not a safe place to work and particularly because of the rushing that they are doing that's preventing them from cleaning to making sure that everything is safe. There's no housekeeping procedures that are articulated. There was never a job safety analysis performed and the plaintiff's expert report stated that. All of the fact witnesses testified after the expert report was issued that yes, we did cover it, but the Derekman, Shelley Davis said, no, we didn't really cover those kind of hazards. It was a really quick meeting. Ultimately, the fact issue is whether or not this was a safe place to work. We think that as a whole, when you look at each and all of these issues as a whole, not in a vacuum as Judge Feldman did, it creates a genuine issue of material fact on whether this is a safe place to work and whether BASIC provided its employee, a seaman, with that safe place to work. What it does with this opinion and with his decision is it really just narrows the law to where it could. If this is a case that doesn't have enough facts to get it to a jury, it's a real slippery slope to where what other GenZAC cases are going to be taken out of the hands of the jury. When you look at it objectively, you've got a routine trip in the pipe operation going on. There's always mud on the pipe. There's no evidence the strippers weren't working correctly. Two men ordinarily handle that. There's no quantification or detail about the extent to which they were being rushed. I mean, to me it's pretty problematic that there's really a question of fact there. Well, Your Honor, we think that it is a question of fact just based on Mr. Smith's testimony alone that it does. If he is correct, they were being rushed, and there's no quantification, but they had to finish that day. Those are just additional questions to ask him in front of a jury and the other witnesses. Have the other potential witnesses been deposed? I'm sorry? Have the other witnesses been deposed? Yes, all but I think one of them was scheduled to be deposed a few weeks after the summary judgment ruling was issued. And they just didn't remember anything particular about that day? They did not recall being rushed. Mr. Porch, who was the tool pusher, testified that he didn't tell his men to go faster, and none of them requested or recalled any particular problems on that date. But again, Mr. Smith did. What did the plaintiff say about how was the message transmitted to him to rush and what was said? Mr. Porch, the tool pusher, told everybody before they started that day that they need to finish, they need to hurry up, and they need to finish that day. They need to go faster than they have been going before. And it really goes down to what is a fundamental principle that if the jury believes a single witness, Mr. Smith, over the other witnesses, they can find in his favor. And his testimony alone I think creates a very genuine issue, several questions on whether or not BASIC provided a reasonably safe place to work, is due to the end of the Jones Act. Or you could say that you spot them, that he was rushed, but that you still don't get to it's unsafe. Just because he's rushed doesn't mean you spot that because there's a fact issue on that. But you say that doesn't get us to any kind of liability. It still does, though, because if they're rushing, they're not performing the job as they should be performing it. Then that's when you get into the other issues of whether or not the mob was caking up, whether or not they had time to perform the housekeeping. I mean, this is the way they perform the job. The mob capes up. You wipe the mud off. There's nothing unusual. But Mr. Smith said it was unusual on that day. It was heavier than normal on that day. And part of that is because they were going faster. And then you've got questions on whether or not if they are rushing, that they had time to do the housekeeping procedures that they normally do. And whether or not they get into, if they were told to rush and they were told not to report the accident, you're just going to try and power through until the end of the hitch. And that, we think, is Mr. Smith's testimony, and we think that's enough to, more than enough, honestly. This isn't a marginal claim. This is better than a marginal claim. It should be presented to the jury. Judge Veldman shouldn't have taken that out of the province of the jury and should go request that it be remanded back. Was there any evidence about the fact that finishing tripping the pipe that day was an unreasonable length of time? How long would have been a reasonable length of time to trip the pipe? I mean, you know, and to a supervisor, certainly within his right to go tell the workers, look, you know, we need to work and get this done within a reasonable time. I mean, is there anything that shows that this was an unreasonable time for him to put on the crew? No, Your Honor. It's just the way that it was informed to them that they needed to finish. I mean, Mr. Smith is a floor hand that's not in his province to guess whether or not how many more things they have. He's seeing the pipe as it comes up, breaking it apart, putting it down, and laying it on the deck. You know, that's not really in his province to estimate how long that should take. Okay. Thank you very much. Thank you very much. Okay. Mr. Keefer. Good morning, Your Honors. My name is Scott Keefer, and I represent Basic Marine. May it please the Court. The district court's grant of summary judgment in favor of Basic Marine on Mr. Smith's Jones Act of Unseaworthiness claims was correct because none of the factual allegations upon which Mr. Smith is relying, even if they are accepted as true, are material to the issues of Basic Marine's negligence, the unseaworthiness of Rig 10, or causation. In considering the claims of Jones Act negligence, there's no evidence in the record that Basic Marine violated a duty of care and the standard of ordinary prudence under the circumstances. Mr. Smith's arguments in his brief primarily focused on the report of Greg Perkin, who was a purported liability expert in the case in an attempt to demonstrate a fact issue. So what we'd like to do is address Mr. Perkin's report first and then look at some of the areas, which are essentially three, where the plaintiff now claims that there are issues of genuine fact, genuine issues of fact that preclude summary judgment as it was granted by the district court. As the district court noted, Mr. Perkin's report made no conclusions that are material to the issues of unseaworthiness, Jones Act negligence, or causation when they're viewed in comparison to the specific allegations of the complaint and the amended complaint as to how the mechanics of the accident allegedly occurred. In his amended complaint, Mr. Smith specifically alleged that he experienced an injury to his left shoulder while working to push pipe through the V door aboard Basic Rig 10. It's significant that Mr. Smith never at any time claimed that he slipped or fell, that there was any problem with footing or substance on the deck that was a causative factor in his alleged accident. Mr. Smith very specifically testified in his deposition that no grease, oil, or foreign substance on the rig floor had anything to do with his accident. We would also note that in that same portion of Mr. Smith's testimony, he stated that it was mud on the pipe that he believed had some cause of his accident and that there was nothing on the rig floor area that had anything to do with his accident. When she's focused in on the three things she's claiming, inordinate amount of mud, being rushed, and short-handed. The first claim deals with the contention as to the accumulation of inordinate amount of mud. There's substantial evidence, including testimony from Mr. Smith himself, that the pipe coming out of the hole would have mud on it. And this was no surprise to Mr. Smith or any other witness. But even if it were accepted as true that there was some mud accumulation, there's nothing in the record demonstrating that some amount of oil-based mud on the rig floor, the V door area, or on the pipe coming out of the hole was unsafe contrary to any of Basic Marine's typical procedures or any industry standard. If you look at the report of Greg Perkett, the only industry standard that he even references as a guideline that he believes comes into play is a housekeeping matter of oil on the rig floor causing a potential for slips, trips, and falls. There's nothing in Mr. Perkett's report that comes to a conclusion that says that an accumulation of pipe on the V door or the rig floor area can cause a hazard such as would occur to Mr. Smith in this case. I mean, heavier than usual doesn't necessarily mean too heavy or unsafely heavy. That is correct, Your Honor. And that's what Judge Feldman came to the conclusion. And it's also significant to note that that was a regular part of Mr. Smith's job. And there's substantial testimony from other witnesses that the pipe was not heavier than usual and that this was the typical type of work string size and weight that was worked with. You have to take that it was heavier than usual. You can't fight the facts. You say it is heavier than usual and he was being rushed. You've got to work in that world. And so even if the pipe was heavier than usual, there's no evidence in the record that Mr. Smith was struggling with the pipe. And there's no evidence from an expert or any other witness how this heavier than usual pipe, while it's still suspended in the elevators, makes any difference to Mr. Smith in the performance of his job duties, even if we make that assumption. Didn't he have the same injury with a regular day too? That is correct, Your Honor. In April of 2012, a little over a month after this incident allegedly occurred, he was performing the exact same function of pushing on the elevators and claims he had some type of re-injury. And in that instance, he makes no reference to the pipe being heavier than usual. And it's also important to note that in that instance, the derrick hand was present on the rig floor during that operation. So he is pushing on the elevators with the derrick hand present on the rig floor, which suggests that that's a normal part of his job duties, and the derrick hand's presence on the rig floor, whether he's there or not, has nothing to do with it. I'm confused of how the presence impacts, assuming that they didn't have the person there. But if he's not asking them to help and he's not stopping to clean it, what does it matter whether the person's there or not? That's correct, Your Honor. There's substantial testimony in the record, even from Mr. Smith, that there's no requirement that the derrick hand be there during pulling out of the whole operations to assist. Now, there's testimony that on the rig, if an employee doesn't have another specific function, he'll be in areas where they may need help to do one thing or another, which could include assisting with that operation. It could include filling ice buckets. It could include doing a variety of other things. As the district court held, there is no evidence in the record that would support a finding that there's some type of industry practice, safety requirement, that the derrick hand participate in the process of pulling out of the hole. But if the facts show that he had said, hey, man, this is getting heavy, I need to stop, where's my hand to help me with this, and it took some time for the hand to come from the other area, then you wouldn't be standing here today, would you? That's correct. Your Honor, there were three times in Mr. Smith's deposition where he was asked about how the derrick hand being there or not being there would have altered his job in any way. In the record at page 307, Mr. Smith was asked how the process works when the derrick hand is present. He says, all Mr. Shelley has to do, I reach and snap the latch on the elevator. You say, you do that? Yeah, I reach and do that, and all Mr. Davis has to do is latch back to the stand that's in the hole as the driller coming down with the elevators. And he was again asked, and would the derrick hand be pushing on the elevators? No, he don't have to push this, you know, just the two floor hands. So if the derrick hand was assisting, he would just be unlatching and not pushing at all. He would just be hooking, I unlatch. So Mr. Smith was very clear that even if the derrick hand is present on the rig floor, he adds nothing to the particular job function that Mr. Smith and the other floor hand are doing, which is moving the section of pipe through the V door so it can be laid down on the barge. How often do you have to change those strippers?  If someone notices that it's not working properly, according to Mr. Porch, the tool pusher, Mr. Bond, the driller, then if someone notices that it's not working properly, then they change it out. And that is another one of Mr. Smith's job functions, is to notice it's not changing properly and change the wiper rubber if he needs to. There is testimony in this case that the wiper rubber was functioning properly. Even Mr. Smith did not say that the wiper rubber was not functioning, and Mr. Porch and Mr. Bond both say that when it's working, it removes 80% to 85% of the mud from the pipe as it comes out of the hole. There is also, there's been some reference to Mr. Smith struggling, and that's the term that's been used. As Judge Feldman noted, the only testimony from Mr. Smith is that on this instance, there was mud on the pipe and it was making his job hard. He didn't say he was struggling. Even if it's true that the supervisor was hurrying the crew, and this gets to Judge Elrod's point, there is no evidence that that altered the manner in which he would do his job. There's no testimony from Mr. Smith or any other witness that Mr. Smith was having to do it in some fashion other than he had done it on five prior occasions as far as moving the pipe through the V-door to get it to slide down so it could be laid down on the barge. Nowhere in Mr. Smith's testimony is there any record evidence that being rushed affected how he performed a job, that it caused him to deviate in some way from his normal method of work. And Mr. Smith, as Judge Elrod pointed out, had also performed the exact same task of pushing on the elevators in the same manner subsequent to the accident in April of 2012 with the derricane present on the rig floor. That's at the record at page 325, 326, and 327. So pushing on the elevators, as the district court noted, was not unique to the job being performed on February 26, 2012, and it was part of Mr. Smith's regular duties as a floor hand. And another thing to note is there's nothing in Mr. Perkins' report, who was the plaintiff's purported liability expert, that being rushed affected some change in Mr. Smith's job duties or how he performed his job on that day. The first contention that Mr. Smith is making on appeal deals with his contention that the accumulation of mud around the V-door and on the tubing was a known hazard to Basic Marine. There's no record evidence that oil-based mud that was being used in this instance was contrary to some industry standard or that it was inappropriate or that it shouldn't have been used. There's no evidence as to how Basic Marine could have known, assuming there was some buildup of mud, how that was making Mr. Smith's task difficult. I think you've covered this. I don't think we understand that. Mr. Smith testified and admittedly did not notify his supervisor that there was any particular issue as to his task and how he was moving the pipe through the V-door. Nor did Mr. Smith admittedly exercise stock work authority, which he knew he possessed. If the Court doesn't have any further questions, I'll cede the remainder of my time. Okay. Thank you, Mr. Keefer. Okay. Back to you, Ms. Goh. Your Honor, on a couple of issues that Basic lawyer addressed, it's whether or not Mr. Smith struggled when he was working on the task once Mr. Davis left the floor. Mr. Davis himself testified that it's harder for the floor hands to do their job when he wasn't there. That's in the record. The real issue is if you look at all three of these issues that you've pointed out, the accumulation of the mud, the rushing, and the lack of cleaning on all of these things, if you look at them independently, they may not be enough, but we're looking at the Jones Act featherweight burden standard, and when you look at them on all three, it's not can we prove it right now. At this point, is it possible any of these can present a genuine issue of fact to present to the jury on not . . . on a featherweight burden standard under the Jones Act? Does your expert's deposition provide any . . . or report provide any support for the three theories you're relying on, or are you just relying on the plaintiff's testimony? At this point, we're relying on the plaintiff's testimony because summary judgment was granted before the expert was deposed. You didn't put any statements? No, we used his report. Does the report have anything that helps on these three issues about the mud, about the rushing? It certainly does. On the accumulation of mud, it certainly does. The housekeeping standards just weren't up to par, and that basic should have known that these were going to be issues. It's not whether or not . . . What should they have done differently on the mud? On the mud, educate the employees better on the housekeeping standards and the hazards imposed by the mud. And also, there should be three people working on this job. As Mr. Davis did testify, it's harder when he wasn't there.  Thank you very much. Thank you, Judge. Thank you, Your Honor. That completes the docket for the day and for the week, and this panel will be in recess under the usual order.